UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

TASHEKA AUTUWEYNA BROWN          CIVIL ACTION NO. 6:19-cv-00342

VERSUS                           JUDGE SUMMERHAYS

U.S. COMMISSIONER, SOCIAL        MAGISTRATE JUDGE WHITEHURST
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be reversed and remanded for further administrative action.

## Administrative Proceedings

The claimant, Tasheka Brown, ("Claimant" or "Brown") fully exhausted her administrative remedies before initiating this lawsuit. She filed an application for disability insurance benefits ("DIB") and an application for supplemental security income benefits ("SSI"), alleging disability beginning on February 2, 2010. *R. 7-1 at 211, 213.*[1] Her applications were denied. *Id. at 108, 109.* She then requested a hearing, which was held on September 11, 2017 before Administrative Law Judge

---

[1]     The Claimant requested that her alleged disability onset date be changed from February 2, 2010 to January 18, 2014, *R. 7-1 at 47*, but the requested change was not reflected in the ALJ's ruling.

Janet Hollings.[2]  The ALJ issued a decision on January 9, 2018, concluding that Brown was not disabled within the meaning of the Social Security Act from February 2, 2010 through the date of the decision. *Id. at 33.*  She requested that the Appeals Council review the ALJ's decision, but the Appeals Council found no basis for review. *Id. at 5.*  Therefore, the ALJ's decision became the Commissioner's final decision for the purpose of the Court's review.  Brown then initiated this action, seeking judicial review of the Commissioner's decision.

## **<u>Summary of Pertinent Facts</u>**

The Claimant was born on September 5, 1975 and was 42 years old at the time of the ALJ's decision. *Id. at 211, 213.*  She attended college for two years, *Id. at 254, 616,* and previously worked as a cashier in a convenience store, a fire watcher in the oilfield, and an administrative assistant for a collections business. *Id. at 63-64, 105-106, 264-268.* She alleged disability beginning on February 2, 2010 or, alternatively, January 18, 2014, due to post-traumatic stress disorder ("PTSD"), anxiety, agoraphobia, poor memory and concentration, depression, panic attacks, isolating behavior, paranoia, and back problems. *Id. at 76-77, 92-93.*

On November 26, 2013, *Id. at 353-356,* Brown established care at SWLA Center for Health Services in Crowley, Louisiana after having been seen at

---

[2]        A transcript of the hearing is found in the record at R. 7-1 at 41-75.

American Legion Hospital for panic attacks.  She complained of sharp chest pain, and it was noted that she was very anxious, with fidgety legs, fingers, and arms.  It was also noted that leaving her home was "a big ordeal" for her because she had been robbed while working in a convenience store.  She gave a history of back surgery in 2005.  She was diagnosed with PTSD, anxiety disorder, and hypertension.  She was prescribed Prozac and Busipirone for anxiety, prescribed Metoprolol for hypertension, and referred to the Tyler Behavioral Health Clinic for psychiatric care.

The Claimant returned to the SWLA Center on December 18, 2013. *Id. at 357-359i.*  It was observed that she was anxious, fidgety, nervous, agitated, and had a trembling voice.  Clonazepam was added to her medication regimen for anxiety.

On January 18, 2014, Brown was admitted to the East Louisiana Mental Health System in Jackson, Louisiana on a physician's emergency certificate ("PEC") after attempting suicide by drug overdose. *Id. at 330-345.*  She was started on Zoloft, Remeron, and BuSpar; started on an alcohol detox regimen;[3] and given Ambien to help her sleep.  The admitting diagnosis was PTSD, and she was assigned a GAF score of 30.[4]  She had a history of PTSD from childhood abuse, which was

---

[3]    There is no evidence in the record that the Claimant drank alcohol after this date.

[4]    The Global Assessment of Functioning ("GAF") scale is used to rate an individual's "overall psychological functioning."  American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).  The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status.  A GAF score in the 21 to 30 range indicates "behavior . . . considerably influenced by delusions or hallucinations OR serious impairment in

reawakened by an armed robbery in February 2013.[5]  She had been having panic attacks and trouble going out in public.  It was noted that she had previously been hospitalized in Georgia in 2005 for mental health problems, had been arrested on an aggravated assault charge at some time in the past, and had a history of back problems.  She appeared anxious and had abnormal behavior and psychomotor activity possibly including tremors.  Her mood was anxious and sad, her intellectual functioning was average, her judgment was fair, her insight was fair, and her impulse control was fair.  She was discharged from the hospital on January 23, 2014, with diagnoses of PTSD and alcohol abuse and a GAF score of 60.[6]  Her prognosis was guarded.  However, her energy level and sleep quality had improved, and she had no thoughts of harming herself or others.  She had shown a reasonable response to her medication, and she was instructed to follow up at a mental health center.

The Claimant met with psychiatrist Dr. Patrice Ambrose on February 3, 2014. She reported a history of panic attacks and indicated that she had recently been

---

communication or judgment. . . OR inability to function in almost all areas. . . ."  The GAF scale was omitted from DSM-5 because of its "conceptual lack of clarity. . . and questionable psychometrics in routine practice."  American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") 16 (5th ed. 2013).

[5]     Some references in the record indicate that the robbery occurred in 2010 while others indicate that it occurred in 2013.

[6]     A GAF score of 51 to 60 indicates moderate symptoms such as flat affect, circumstantial speech, occasional panic attacks or moderate difficulty in social, occupations, or school functioning.  DSM-IV at 32.

hospitalized with depression and worsening anxiety attacks, which had stabilized with medication.  She reported that her mood was stable, but she continued to experience anxiety and was agoraphobic.  Dr. Ambrose found that Brown had normal alertness, good eye contact, blunted affect, anxious mood, normal speech, cooperative attitude, non-psychotic thought content, unremarkable perception, no thoughts of harm, fair concentration, intact memory, and good intellect, insight, and judgment.  Dr. Ambrose planned to continue Zoloft, Remeron, and BuSpar and have the Claimant engage in individual therapy. *R. 7-1 at 412-413.*

On March 6, 2014, the Claimant was evaluated at the Joseph Henry Tyler Behavioral Health Clinic in Lafayette, Louisiana reporting ongoing symptoms of depression, anxiety, social phobia, and an inability to be in crowds since the robbery incident.  Her functional status impairment rating was "moderate."  It was observed that she rocked back and forth when sitting, her attitude was motivated and cooperative; her speech was normal; her mood was irritable, anxious, and tense; her affect was appropriate; she reported no perceptual disturbances; her thought process was logical and coherent; she had attempted suicide in January 2014; she was alert and oriented but had impaired concentration; her immediate recall was impaired while her remote and recent memory were intact; her intellectual functioning was normal; her judgment was intact; she had some awareness of her illness and symptoms; and she was able to resist impulses.  She had previously been arrested

5

for aggravated assault and had been incarcerated. PTSD and anxiety disorder were diagnosed. It was also noted that she had chronic back pain. *Id. at 404-411*.

On the same date, the Claimant had psychotherapy with licensed clinical social worker Debra Milson. Milson noted that the Claimant was "rocking back and forth throughout the entire session" and reported feeling uncomfortable when not at home. The Claimant again met with Milson on April 4, 2014 and discussed her relationship difficulties, her inability to get out in public, and her fear of being in a car with anyone. *Id. at 402*.

Brown met with Dr. Ambrose on May 2, 2014. She reported that her medications were helpful, her sleep and appetite were good, and her mood was stable, but she continued to have anxiety and frequent panic attacks. Dr. Ambrose found that her affect was tearful, her mood was anxious, her speech was within normal limits, her attitude was cooperative, she had no thoughts of harming herself or others, her thought content was nonpsychotic, her concentration was fair, her memory was intact, and her intellect, insight, and judgment were good. Her Buspar dosage was increased, and Dr. Ambrose noted that the "patient is unable to sustain gainful employment at this time." *Id. at 400-401*.

On May 30, 2014, Brown again met with Milson for psychotherapy. She reported taking her medication as directed and stated that a recent medication change had helped some, but she was having continued anxiety. She was rocking and her

6

legs were shaking.  She had difficulty controlling the behavior during the session, and she reported that it began after the robbery incident. *Id. at 399*.

On July 22, 2014, Brown complained to Milson of chronic back pain.  She was not rocking and had been able to teach vacation Bible school for one week in a safe, controlled environment. However, she reported that she recently went shopping with her sister and became very anxious.  She reported being fearful in public, stated that she did not drive or have a driver's license, and had anxiety attacks when people failed to understand her fears.  Her goals were to reduce coffee and cigarette usage and to complete short shopping trips with her fiancé. *Id. at 398*.

The Claimant saw Dr. Ambrose on August 5, 2014. Dr. Ambrose reported that the Claimant was much improved with a stable mood.  Her affect was appropriate, her mood was euthymic and stable, and her anxiety symptoms were controlled with medication.  Dr. Ambrose increased her Remeron dosage. *Id. at 396-397*.

When the Claimant met with Milson on August 25, 2014, she was crying and complained of increased anxiety and feeling overwhelmed. She was disagreeing with her fiancé on financial issues, and she felt her family would be critical of her. *Id. at 395*.

On September 29, 2014, the Claimant told Milson that her son had moved in with she and her fiancé and her wedding had been postponed.  She was anxious. *Id. at 394*.

On November 3, 2014, Dr. Ambrose noted that Brown was experiencing a recurrence of depressive and anxiety symptoms.  She was very irritable and reported a depressed mood and isolating behavior.  Her Zoloft dosage was increased. *Id. at 393.*

Brown saw Milson again on November 17, 2014 and December 29, 2014. Although she was taking her medication as prescribed, she continued to complain about anxiety especially in crowds.  She had difficulty going to church because of the presence of others, and she feared that someone might try to harm her.  She also complained about chronic back pain. *Id. at 391, 392.*

When the Claimant saw Dr. Ambrose on January 29, 2015, she was stable and coping well with stressors.  Her medications and individual counseling sessions were continued. *Id. at 393.*

On March 19, 2015, Brown met with Milson and discussed her relationship with her husband.  On April 2, 2015, the Claimant told Milson about a recent outing. She agreed to go to at least one new place each week and to go outside and walk at least once each week.  They discussed the Claimant's rocking behavior and her family dynamics. *Id. at 390.*

Brown saw Dr. Ambrose again on April 29, 2015.  Dr. Ambrose noted that she was doing well and that her anxiety symptoms were controlled with medication.

Her affect was appropriate, her mood was euthymic, her thought content was nonpsychotic, and her memory was intact. *Id. at 387-388.*

On May 13, 2015, the Claimant continued discussions with Milson about exposure/desensitization techniques, the robbery, her relationship with her husband, and the fact that being around others made her extremely anxious. *Id. at 386.*

On May 21, 2015, Brown was seen at the SWLA Center.  She was counseled to stop smoking and lose weight, and her medications were reviewed.

On June 25, 2015, Brown told Milson that news stories concerning a shooting in South Carolina had increased her depression and anxiety, triggering memories of the robbery.  She reported flashbacks and increased isolating behavior.  The Claimant saw Dr. Ambrose that same day.  Dr. Ambrose stated that she was doing well and coping well with stressors, found her affect to be appropriate, her mood to be euthymic, and her thought content to be nonpsychotic. *Id. at 384-385.*

On July 23, 2015, Milson noticed that Brown was again rocking.  Brown stated that she rocks when she leaves the house to calm herself.  She reported having fewer anxiety attacks and only having them when away from home for an extended period.  She also reported that things were going well at home with her husband and son, that her depression was less severe, but that her anxiety had increased, especially in church. *Id. at 382.*

9

The Claimant's function report of August 6, 2015 addressed her physical and mental impairments. She reported that her back condition prevents her from sitting or standing for extended time periods and requires her to change position often. She stated that it was difficult to bend over to put on her shoes and pants and also difficult to lift her arms over her head. She stated that she cut her hair short so that she would not have to lift her hands over her head to style her hair. She estimated that she was able to walk only about half a block. With regard to her mental health impairments, she indicated that she had days when she could not get out of bed. Leaving the safety of her home was very difficult for her and being with people other than her family members was very stressful and often resulted in her becoming aggravated or having panic attacks. Brown indicated that she heard people talking who were not there, had trouble grasping what people were saying, had trouble concentrating, had trouble completing tasks that she started, and had trouble following written and spoken instructions. She stated that she did not like being in crowds and could not get over having had a gun put to her head. She stated that she went through that event every day and could not let it go. She stated that, in church, she was always looking over her shoulder. She worried all day with racing thoughts she could not control. Her sleep was disturbed by dreams of being shot and killed by a robber. *Id. at 273-280*.

Brown's sister, Levaior Stevens, also filled out a report regarding the Claimant's functionality. Stevens stated that she saw her sister two to three times per week. She stated that the Claimant was unable to stand or sit for long periods of time due to constant back pain, did not feel safe around others, had a hard time leaving her house, and had trouble finishing what she started. Stevens stated that she made sure her sister took her medication. She stated that her sister spent a lot of days in bed, got dressed only when she had some place to go, and cut her hair to avoid styling it. She stated that her sister used to cook full meals but, due to her illness, now only made sandwiches or microwave meals. She stated that her sister went out of the house only about twice per week because she was afraid of being attacked. She also stated that Brown did not drive because she was scared. Stevens indicated that the Claimant could not pay bills or handle bank accounts but could count change. She stated that her sister previously had an outgoing personality. She confirmed that her sister went only to doctor's appointments and church, that someone must accompany her, and that family members did her shopping. She stated that her sister's memory was poor, she lacked concentration, and she often failed to complete tasks. Stevens stated that her sister's "mind aint [sic] right." She also said, "she's not who she used to be." *Id. at 282-289.*

Brown returned to see Milson on August 20, 2015. She was fidgeting, rocking, and anxious, and stated that it was not a good day. She admitted worrying

a lot and being concerned about whether someone would come into church or a store and start shooting.  She also reported increased back pain. *Id. at 381*.

On October 1, 2015, Milson noted that Brown's level of functioning was improving because she had participated in more church activities, but she was continuing to rock when anxious.  Brown complained about chronic low back pain and about a loss of feeling in the ring and pinky fingers of her left hand.  She remained unable to go into a convenience store. *Id. at 483.*

On October 9, 2015, Brown was examined by Dr. Julana Monti at the request of Disability Determination Services.  The Claimant reported that she had last worked as a cashier in a convenience store but was robbed at gunpoint while working and never went back.  She reported having a lot of anxiety following that incident, and usually did not leave her house.  She also reported having had sudden paralysis in 2005, followed by a disc replacement procedure and low back pain that never went away.  She reported chronic left hip bursitis.  Finally, she reported the development of numbness in the ring finger and little finger of her left hand that had not yet been evaluated.  Dr. Monti obtained x-rays of the Claimant's lumbrosacral spine, which were unremarkable except for a possible remote compression fracture. X-rays of the Claimant's left hip were also unremarkable.  Dr. Monti diagnosed the Claimant with chronic low back pain, a possible remote compression fracture, history of lumbar disc replacement, mild thoracic scoliosis, and anxiety disorder.

She opined that the Claimant could sit for eight hours, stand for eight hours, walk for eight hours, and lift or carry objects weighing up to fifteen pounds. She opined that there were no restrictions on the Claimant's ability to read, drive, or perform fine motor tasks such as writing. She further opined that the Claimant was able to interact effectively and peaceably with others, understand and follow instructions, and communicated without difficulty. However, she did not evaluate whether Brown's anxiety disorder resulted in any functional limitations. *Id. at 426-429*.

At Brown's October 29, 2015 appointment with Milson, she had difficulty sitting in a chair and complained about pain in her back and left hand. She reported having gone to the emergency room the previous weekend because of this pain. She also reported continued anxiety when around others and an inability to drive due to fear of being in traffic. *Id. at 482*.

Between October 2015 and October 2016, Brown was seen at University Hospital and Clinics ("UHC") in Lafayette, Louisiana a few times for the treatment of hypertension, hyperlipidemia, neck pain, chronic back pain, and the removal of a cyst or abscess behind her left ear. *Id. at 490-612*. On August 2, 2016, she underwent cubital tunnel release surgery on her left elbow at UHC. The treatment notes indicate that she also had been diagnosed with anxiety, was prescribed medications to treat her anxiety, and had undergone back surgery in 2005. On July 12, 2016, it was noted that she was "very anxious." *Id. at 552*.

13

Brown saw Dr. Ambrose on December 14, 2015. Dr. Ambrose found that her posture, eye contact, activity, perception, thought contact, cognition, and judgment were all within normal limits.  Her attitude was cooperative, her mood was euthymic, her affect was full range, her thought process was logical, and no hallucinations or delusions were reported.  Dr. Ambrose noted that Brown was doing well, her sleep and appetite were good, her mood was stable, and she had no side effects to her medications.   The plan was to continue her medications and her individual counseling. *Id. at 473-479*.

When Brown met with Milson that same day, however, she reported increased anxiety and anxiety attacks, particularly at a funeral and when shopping with her mother.  She also reported recently hearing voices, hearing someone knocking at the door, and seeing shadows.  Although she had seen Dr. Ambrose that morning, she did not report these symptoms because she was embarrassed and thought she might be hospitalized.  She also complained about being tired all the time despite getting adequate sleep.  *Id. at 480-481*.

When Brown saw Milson again on January 13, 2016, she denied having hallucinations.  She had been going to multiple physical health appointments and reported that her anxiety increased with each appointment.  *Id. at 471-472*.

Brown reported to Milson on February 10, 2016, that she was having an increased number of anxiety attacks, especially in the early morning, at the rate of

two to three per day.  She denied hallucinations but reported that she found her medications ineffective.  She reported dreams about fighting people who were attacking her and had fallen out of bed during one such dream.  She was encouraged to go out on a regular basis and to change her mindset regarding depression, anxiety, and isolation. *Id. at 469-470*.

On March 16, 2016, Brown again saw Dr. Ambrose.  She reported having had more panic attacks over the previous four weeks without specific triggers.  Dr. Ambrose found that her posture, activity, perception, thought contact, cognition, and judgment were all within normal limits.  Her attitude and her mood were anxious, her affect was blunt, her speech was clear, her thought process was logical, and no hallucinations or delusions were reported.  Dr. Ambrose noted that her mood was stable, and her sleep and appetite were good.  Dr. Ambrose increased her Zoloft dosage and added a trial of Vistaril. *Id. at 460-466*.

That same day, Brown began seeing licensed clinical social worker Jennifer Bell.  Ms. Bell noted that she was very anxious and exhibited constant leg shaking.  Ms. Brown stated that she was hyper vigilant and did not like to leave her home; however, her nightmares were less violent.  When she was encouraged to discuss the event that led to her present symptoms, she talked about the robbery.  Relaxation techniques were discussed. *Id. at 467-468*.

On April 13, 2016, Brown again saw Bell.  She was more relaxed during this session and stated that the medication adjustment and breathing techniques introduced at the last session were helpful.  However, she continued to isolate at home, going only to church and to counseling sessions.  Desensitization techniques were again discussed. *Id. at 458-459*.

When Brown returned to see Bell on May 11, 2016, she was lethargic and in pain.  She reported that she had not slept well the night before due to back pain.  She described her mood as "so so" and stated that she was anxious about a nephew's upcoming high school graduation, reporting that she would like to attend but was apprehensive about the crowd.  She also reported that her anxiety attacks had decreased since her medication was adjusted. *Id. at 454-457*.

On May 16, 2016, Brown saw Dr. Ambrose, who noted that she was dealing with multiple stressors, her pain symptoms were worsening, and she was scheduled to see an orthopedist.  Her sleep and appetite were described as "ok," and it was noted that she found her medications to be effective.  Dr. Ambrose found that Brown's anxiety symptoms were controlled, speech was at a normal rate, her mood was neutral, her affect was blunted, her thought process was goal directed, her associations were intact, and no abnormal psychotic thoughts were noted.  Her judgment and insight were good.  Her medications were continued.  Dr. Ambrose opined that Ms. Brown was "unable to sustain gainful employment." *Id. at 448-453*.

When Brown saw Bell again on August 4, 2016, her arm was in a sling due to recent surgery, and it was difficult to evaluate her mood due to pain medication. Brown reported having had a panic attack during her nephew's graduation in May and stated that she went to church and Wal-Mart only.  She displayed no anxiety during the session.. *Id. at 446-447.*

The Claimant returned to see Dr. Ambrose on August 30, 2016.  It was noted that she had been taken off all of her medications temporarily for surgery, and she experienced a recurrence of anxiety symptoms; however, she had restarted her medications and her anxiety symptoms were improving.  Dr. Ambrose found that her speech was at a normal rate, her mood was neutral, her affect was blunted, her thought process was goal directed, her associations were intact, she had no abnormal psychotic thoughts, she was alert and oriented, her recent and remote memory were intact, her judgment was good, and her insight was good.  She was to continue her medications and individual psychotherapy.  In Dr. Ambrose's opinion, she remained "unable to sustain gainful employment." *Id. at 440-445.*

On November 17, 2016, Brown again saw Dr. Ambrose, reporting that issues in her marriage were triggering her PTSD symptoms including nightmares and flashbacks of previous abuse.  She was tearful and reported increased depression and crying spells.  Her speech was soft, her mood was sad, her affect was blunted, her thought process was goal directed, her associations were intact, no abnormal

17

psychotic thoughts were noted, her attention span was distractible, her remote and recent memory were intact, and her judgment and insight were good.  Dr. Ambrose noted that she met the criteria for Major Depressive Disorder.  She was to continue her medication and individual counseling sessions.  *Id. at 434-439*.

On December 12, 2016, Brown met with licensed clinical social worker Alice Robin for individual counseling.  The Claimant reported being afraid, which was triggered by her car ride to the clinic.  "She constantly worried about if someone was going to cause her harm."  She referenced an abusive marriage and her current husband's yelling.  Robin indicated that twice monthly counseling sessions might be necessary. *Id. at 432-433*.

On January 23, 2017, Brown met with Dr. Ambrose, who characterized her mental health impairments as PTSD and Major Depression Disorder, severe, recurring.  Dr. Ambrose noted that Brown continued to deal with multiple stressors and had continued anxiety and depression, but she also noted that her medications were "most effective."  She further noted that the Claimant had been experiencing frequent triggers that precipitated PTSD symptoms.  Dr. Ambrose found that Brown's speech was at a normal rate; her mood was anxious and sad; her affect was blunted; her thought process was goal directed; her associations were intact; there were no abnormal psychotic thoughts; her recent and remote memory were intact; and her judgment and insight were good.  The diagnoses assigned were PTSD and

severe major depressive disorder, recurrent episode without psychotic features. The Claimant's medications were continued. Dr. Ambrose also noted that "[s]he is unable to sustain gainful employment." *Id. at 643-649*.

The Claimant saw Robin again on February 7, 2017. A mental health treatment plan of that date indicates that Brown had "severe and persistent mental illness" as well as PTSD and physiological reactivity when exposed to internal or external cues that symbolize the traumatic event. It stated that the goal of psychotherapy was to reduce the negative impact that the traumatic event had on many aspects of the Claimant's life and to return her to a pre-trauma level of functioning. The Claimant explored her feelings of resentment toward her husband who often unknowingly triggered her symptoms. *Id. at 639-642*.

Brown again saw Dr. Ambrose on March 22, 2017. The treatment note indicated that the Claimant was "at baseline" with continued depression and anxiety but coping better with stressors.[7] Dr. Ambrose noted that the Claimant was dealing with multiple stressors that caused frequent exacerbation of symptoms and further noted that the Claimant's medications were effective. Her speech was at a normal rate; her mood was anxious and neutral; her affect was blunted; her thought process was goal directed; her associations were intact; there were no abnormal psychotic

---

[7]     A "baseline" is a "line serving as a basis, as for measurement, calculation, or location" or a "starting point." The American heritage Dictionary of the English Language (5th ed. 2011).

thoughts; her attention span and concentration were distractible; her recent and remote memory were intact; and her judgment and insight were good.  Dr. Ambrose opined that the Claimant was "unable to sustain gainful employment." *Id. at 630-638.*

Brown met with Robin that same day.  The Claimant had been experiencing disturbed sleep, and she cried during the therapy session.  She reported having had a panic attack in a store while attempting to purchase birthday cards and being unable to complete that task.  The Claimant developed a plan to try to use Medicaid transportation for every other mental health appointment to try to overcome her fear of riding in vehicles. *Id. at 637-638.*

Brown saw Robin again on April 21, 2017.  She had not been sleeping well due to chronic neuropathic pain in her feet and legs.  She reported often feeling overwhelmed by trauma-related anxiety and identified her chronic pain as a source of her depression symptoms. *Id. at 628-629.*

On April 23, 2017, Brown saw psychologist Naomi L. Friedberg, Ph.D., at the request of her counsel, for the purpose of a mental status examination.  In preparation for the examination, Dr. Friedberg reviewed the Claimant's mental health treatment records, including records documenting a psychiatric hospitalization in Georgia in 2005, another psychiatric hospitalization following a suicide attempt in 2014, and records from three years of outpatient therapy and medication management of PTSD,

anxiety disorder, and chronic back pain.  Dr. Friedberg gleaned from the treatment records that Brown had an increase in anxiety after being held at gunpoint during an attempted robbery in 2010 and had been unable to be in crowds since that time. According to Dr. Friedberg, the treatment records showed that Brown had relationship problems due to fears and phobias, panic attacks, psychomotor agitation including rocking back and forth, agoraphobia, an inability to sustain employment, an inability to drive, insomnia, financial problems, and chronic back pain.  Dr. Friedberg also noted that the records documented auditory and visual hallucinations, nightmares, and difficulty trusting others.  Dr. Friedberg observed that the records showed periods of time when Brown's symptoms of depression and anxiety improved, but she noted that those improvements were short-lived.  Dr. Friedberg further noted that "the severity of Brown's symptoms seems to wax and wane, but she does not seem to go any period of time symptom free, and most of the time her independent daily adaptive functioning is reported to be significantly, negatively impacted." *Id. at 614-622*.

Brown told Dr. Friedberg that she rarely left her home and did not drive because of anxiety.  She asked if she could move around during the interview due to back pain and anxiety.  Dr. Friedberg observed that the Claimant's mood and affect were anxious and somber, and further observed that her anxiety level rose when she discussed a past traumatic event.  Brown told Dr. Friedberg that she was molested

as a child, had an abusive first marriage, and was in an abusive second marriage. She reported that her mental health functioning, adaptive daily functioning, and ability to maintain employment were greatly negatively impacted when she developed PTSD after being held at gunpoint by a masked assailant while at work in 2010. She claimed that, after that incident, she had great difficulty leaving her home and usually left only for church and doctor's appointments. She was taking Gabapentin, Flexeril, Hydroxyzine Pamoate, Diclofenac, Sertraline, Lovastatin, Buspirone HCL, and Mirtazapine. Brown reported that her depression level and symptomology fluctuated but seemed to worsen around February, the month in which the traumatic incident had occurred. *Id.*

Dr. Friedberg diagnosed the Claimant with persistent depressive disorder with intermittent major depressive disorder, with current episode, and PTSD. In her opinion, Brown's ability to understand, remember, and carry out detailed instructions in an employment setting was greatly negatively impacted by severe, persistent, and chronic depression and anxiety. Dr. Friedberg further opined that the Claimant's symptoms of depression and PTSD negatively impacted her adaptive functioning, cognitive functioning, and ability to maintain attention to perform simple tasks for two-hour blocks of time and to persist at a normal pace over the course of a routine forty-hour work week. Dr. Friedberg noted that Brown had a quiet, fearful demeanor and reported self-isolation, which would likely result in her

having trouble getting along with coworkers and supervisors.  She further opined that Brown's severe, chronic, and treatment-resistant depression and PTSD significantly impaired her ability to tolerate the stress and pressure of day-to-day work activity and demands.  Finally, Dr. Friedberg stated that Brown might require assistance in managing her financial affairs due to her poor judgment. *Id.*

Dr. Friedberg completed a medical source statement in which she evaluated Brown's functionality.  She found that, in the category of understanding and memory, Brown had mild limitations in one subcategory, moderate limitations in one subcategory, marked limitations in two subcategories, and extreme limitations in the ability to carry out detailed instructions.  In the category of concentration and persistence, Dr. Friedberg found that Brown had marked limitations in two subcategories and extreme limitations in the subcategories of ability to sustain an ordinary routine without special supervision and ability to complete a normal workday and work week without interruption from psychologically-based symptoms without an unreasonable number and length of rest periods.  The social interaction category has six subcategories, and Dr. Friedberg found that Brown had marked limitations in five of the six and extreme limitations in the final subcategory – the ability to accept instructions and respond appropriately to criticism from supervisors. In the category of adaptation and judgment, Dr. Friedberg found that Brown had moderate limitations in one subcategory, marked limitations in three subcategories,

and extreme limitations in the subcategories of the ability to travel to and from work by private or public transportation and the ability to tolerate normal levels of work place stress.  In Dr. Friedberg's opinion, Brown's psychological symptoms would likely interfere with her ability to maintain attention to simple, routine tasks at least twenty percent of an eight-hour workday.  Dr. Friedberg also estimated that Brown might be absent from work due to her mental impairments or mental health treatment several times each month. *Id.*

On June 8, 2017, Brown returned to Dr. Ambrose. Dr. Ambrose again characterized her as being "at baseline."  She stated that the Claimant's mood was stable with continued anxiety, that the Claimant was dealing with issues that trigger anxiety in therapy sessions, and that her medications were effective.  Dr. Ambrose found that the Claimant's speech was at a normal rate; her mood was anxious and neutral; her affect was blunted; her thought process was goal directed; her associations were intact; there were no abnormal psychotic thoughts, suicidal ideation, or homicidal ideation; her attention span and concentration were distractible; her recent and remote memory were intact; and her judgment and insight were good.  Brown was to continue her medications and individual therapy. *Id. at 657-662.*

Brown met with Robin on May 25, 2017, reporting continued sleep disturbances due to chronic pain in her right foot and stating that she was

overwhelmed with anxiety when thinking about travel to another area. She discussed her phobia of riding in vehicles and admitted avoiding medical treatment due to this phobia. She acknowledged that her depressive symptoms might decrease if her pain were managed better. *Id. at 655-656.*

When Brown saw Robin again on June 8, 2017, she was eating only one meal a day and losing weight. She agreed to see a podiatrist for her foot pain. The treatment note indicates that making appointments was a major trigger for her anxiety because of her phobic response to riding in a vehicle. *Id. at 653-654.*

Brown met with Robin again on July 11, 2017. Her appetite had not changed, and she continued to have sporadic sleep disturbances. She stated that she felt anxious about financial matters and avoided this with her husband. *Id. at 651-652.*

On September 11, 2017, Brown testified at a hearing in the instant action regarding her symptoms, her medical treatment, and her functionality. *Id. at 41-75.* Brown testified that it had "been years" since she had driven a car and did not have a current driver's license. She testified that she became very nervous in a vehicle and could not travel on public transportation because she did not trust people and was paranoid. She stated that she only left her home to go to church or to medical appointments. She also stated that she will not answer the door if someone knocks without advance notice because she does not trust people. She keeps blinds, curtains, and dark plastic on her windows because she likes her house to be dark. She

attributed her paranoia to the robbery incident.  She testified that the church she attends is a family church with only about ten members.  When she taught vacation Bible school for a week at the church, she was teaching a very small group of children in her family.  Despite taking psychoactive medication, which she described as "helping me to stay a little stable," she testified that her visual hallucinations had not completely gone away and that she occasionally saw shadows but tried not to pay attention to them.  She also testified that she continued to have panic attacks that felt like her throat was closing up and she could not breathe.  She stated that she took Vistaril when having such an attack, which took thirty to forty-five minutes to make her symptoms subside and then caused her to go to sleep.  She testified that she did not get out of bed on bad days.  She stated that she experienced depression, mood swings, and crying spells as well as isolating behavior, characterized by failing to participate in family gatherings or activities, sometimes refusing to talk with her husband, and sometimes refusing to talk on the phone with her mother.  She also stated that she did not like being outside her house and did not use the porch that her brother added to her house.

Brown testified that, in her opinion, her condition had remained the same since she began mental health medication and counseling after being hospitalized in 2014 despite more than three years of compliance with a medication regimen and regular

psychotherapy sessions.  She stated that she continued to treat at the Tyler Center without improvement because she did not know where else to go for help.

Brown stated that her back problems affected her ability to stand or sit every day and also stated that she had trouble concentrating or paying attention.  She stated that her appetite and her weight fluctuated and that her sleep had improved with medication.  She testified that she had not drunk alcohol since being released from the hospital in January 2014.

### Analysis

**A.    Standard of Review**

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[8]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[9]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be

---

[8]      *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[9]      *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[10]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[11]   In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[12]   Conflicts in the evidence[13] and credibility assessments[14] are for the Commissioner to resolve, not the courts.   Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:   (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[15]

---

[10]     *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[11]     42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[12]     *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[13]     *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[14]     *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[15]     *Wren v. Sullivan*, 925 F.2d at 126.

B.     <u>**Entitlement to Benefits**</u>

DIB provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[16]  SSI provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled.[17]  A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[18]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[19]

---

[16]     See 42 U.S.C. § 423(a).  See, also, *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019).

[17]     42 U.S.C. § 1382(a)(1) & (2).  See, also, *Smith v. Berryhill*, 139 S.Ct. at 1772.

[18]     42 U.S.C. § 1382c(a)(3)(A).

[19]     42 U.S.C. § 1382c(a)(3)(B).

## C.    <u>Evaluation Process and Burden of Proof</u>

A sequential five-step inquiry is used to determine whether a claimant is disabled.  The Commissioner must determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[20]

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity[21] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[22]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[23]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[24]  This burden may be

---

[20]    20 C.F.R. § 404.1520.

[21]    20 C.F.R. § 404.1520(a)(4).

[22]    *Perez v. Barnhart*, 415 F.3d 457, 462 (5th Cir. 2005) (citing 20 C.F.R. § 404.1545(a)(1)).

[23]    20 C.F.R. § 404.1520(e).

[24]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[25]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[26]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[27]

## D.    The ALJ's Findings and Conclusions

In this case, the ALJ determined, at step one, that the Claimant has not engaged in substantial gainful activity since February 2, 2010. *Rec. Doc. 7-1 at 21.* This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the Claimant has the following severe impairments:  mild thoracic spondylosis and scoliosis, status post left cubital tunnel decompression, anxiety disorder, persistent depressive disorder with intermittent major depressive disorder, and PTSD. *Rec. Doc. 7-1 at 22*.  This finding is supported by substantial evidence in the record.

---

[25]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[26]     *Perez v. Barnhart*, 415 F.3d at 461; *Fraga v. Bowen*, 810 F.2d at 1302.

[27]     *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

At step three, the ALJ found that the Claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment. *Id. at 22.* The Claimant did not challenge this finding.

The ALJ found that the Claimant has the residual functional capacity to perform light work with the following limitations: she must be able to alternate between sitting, standing, and shifting positions so long as she is not off task more than five percent of the day; she can occasionally balance, stoop, kneel, crouch, and climb ramps or stairs; and she can frequently handle objects with her left hand. Further, due to her mental impairments, she can perform simple, routine tasks and can make simple work-related decisions but cannot perform production rate or pace work, and she can only occasionally interact with supervisors, coworkers, or the public. *Id. at 25.* The Claimant challenged this finding.

At step four, the ALJ found that the Claimant is not capable of performing any past relevant work. *Id. at 31.* The claimant did not challenge this finding.

At step five, the ALJ found that the claimant was not disabled from February 2, 2010 through January 9, 2018 (the date of the decision) because there are jobs in the national economy that she can perform. *Id. at 33.* The Claimant challenged this finding.

E.    **The Allegations of Error**

The Claimant contends that the ALJ erred by improperly applying the special technique for evaluating mental impairments, failing to properly evaluate the medical opinion evidence, and failing to properly account for all of the functional limitations caused by mental impairments in the residual functional capacity assessment.  These alleged errors can be addressed together by analyzing the ALJ's evaluation of the Claimant's residual functional capacity

G.    **Did the ALJ Err in Evaluating the Claimant's Residual Functional Capacity?**

The ALJ is responsible for determining a claimant's residual functional capacity ("RFC").[28]  In doing so, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations.[29]  The ALJ must consider all symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  The ALJ must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not severe.[30]

---

[28]    *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

[29]    *Martinez v. Chater*, 64 F.3d at 176.

[30]    *Giles v. Astrue*, 433 Fed. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. § 404.1545).

Although the ALJ has sole responsibility for determining the claimant's disability status,[31] the "ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."[32]  Opinions from any medical source on issues reserved to the Commissioner must never be ignored.[33]

The opinions of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be accorded great weight by the ALJ in determining disability.[34]  "[T]he opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician."[35]  While an ALJ may reject a doctor's opinions for good cause, "[s]he cannot independently decide the effects of Plaintiff's . . . impairments on [her] ability to work."[36]  Consistently, "an ALJ may not – without the opinions from medical experts – derive the applicant's residual functional capacity based solely on the evidence of his or her

---

[31]    *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).

[32]    *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).

[33]    SSR 96-5P -- Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner, 1996 WL 374183, at *3.

[34]    *Pineda v. Astrue*, 289 Fed. App'x 710, 712-713 (5th Cir. 2008), citing *Newton v. Apfel*, 209 F.3d at 455.

[35]    *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987).

[36]    *Shugart v. Astrue*, No. 3:12–CV–1705–BK, 2013 WL 991252, at *5 (N.D. Tex. Mar. 13, 2013).

claimed medical conditions [and] an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions."[37]

In this case, three mental health professionals opined on the Claimant's functionality.  The ALJ gave little weight to the opinions of two of them and partial weight to the opinions of the third.  The ALJ gave little weight to "the claimant's mental health care providers" including her treating psychiatrist, Dr. Ambrose. *R. 7-1 at 29.*  On several occasions Dr. Ambrose noted that, in her opinion, the Claimant was incapable of sustaining employment. While the ALJ explained that a treating physician's opinion regarding a Claimant's employability need not be given any special significance but "should still be considered," she rejected Dr. Ambrose's opinions because: (1) it was not based on a function-by-function assessment of the Claimant's mental abilities; (2) it was overly broad, general, and of limited value; and (3) it was inconsistent with the majority of the treatment notes. *Id.*  While the ALJ was correct that a doctor's opinion on the ultimate question of whether a claimant is disabled is not entitled to any weight at all[38] because whether a claimant is disabled is a determination reserved to the Commissioner,[39] the ALJ erred in

---

[37]    *Williams v. Astrue*, 355 Fed. App'x 828, 832 n.6 (5th Cir. 2009) (citing *Ripley v. Chater*, 67 F.3d at 557).

[38]    *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003).

[39]    20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

concluding that Dr. Ambrose's opinions were inconsistent with the majority of the treatment notes.[40]

Throughout the ruling, the ALJ described the Claimant's mental status evaluations as "relatively normal," "normal," and "largely normal" and cited to specific treatment notes. The record provides that the ALJ's characterization of the mental status evaluations, however, was inaccurate.[41] For example, one of the cited treatment notes was while the Claimant was still hospitalized for in-patient mental health treatment having attempted suicide a few days earlier, *R. 7-1 at 342-344;* one of the treatment notes indicated that the Claimant's mood was depressed, her affect was blunted, and an increased dosage of psychoactive medication was necessary, *Id. at 393;* another noted that the Claimant's affect was tearful and her mood was anxious, *Id. at 400, 417;* another noted that the Claimant's affect was blunt and her

---

[40]    The Claimant testified at the hearing that she had detected no improvement in her mental health condition from the time of her hospitalization in May 2014 to the time of the hearing in September 2017. Dr. Ambrose's opinion that the Claimant remained "at baseline" in March and June 2017 corroborated the Claimant's contention that her condition was unchanged/unimproved despite three years of mental health treatment.

[41] The record indicates that the Claimant reported more severe symptoms to the social worker, Milson, than she did to Dr. Ambrose, for fear of embarrassment or hospitalization. *Id. at 480-481.* The Claimant's reluctance could be a partial explanation for some of the allegedly "normal", "relatively normal" or "largely normal" findings in Dr. Ambrose's records. The Milson's treatment notes also indicate that the Claimant's paranoia and agoraphobia interfered with her obtaining treatment for physical medical conditions that indirectly, cause pain and therefore contribute to her depression. *Id.*

attitude toward the examiner was anxious, *Id. at 461-462*; another noted that her mood was anxious and her affect was blunted, *Id. at 631*.

The ALJ also cited Dr. Monti's report in support of her position.  Dr. Monti apparently has no expertise in psychology or psychiatry yet opined that the Claimant "does not appear depressed, agitated, or anxious" even though she expressly stated that she did not evaluate whether the Claimant had any limitations caused by the Claimant's anxiety disorder. *Id. at 427-428.*  The Court finds it notable that the ALJ ordered a physical evaluation by a consultant physician but no mental health evaluation even though it was clear from the outset that the Claimant's primary problem was in the nature of mental health impairments rather than physical complaints.

Furthermore, on each date that the ALJ described the Claimant as having an essentially normal mental health status, it was recommended by the Claimant's treating physician – whether while hospitalized or while treating with Dr. Ambrose – that the Claimant should continue to take prescribed psychoactive medications and continue to engage in psychotherapy.  It is axiomatic that a person whose mental health status was normal would not require this treatment.

The evidence in the record demonstrates that the Claimant's symptoms did improve at times for short periods of time, as documented by Dr. Ambrose and recognized by Dr. Friedberg.   The Court finds, however, that the ALJ's

characterization of the record as containing "numerous instances where the Claimant had relatively normal diagnostic results," *Id. at 23, 24, 27*, "normal mental status *Id. at 30,* is inconsistent with the cited evidence and the record as a whole.  The ALJ could have reached this conclusion that the Claimant's mental status was normal only by selecting supporting evidence while ignoring contrary evidence. Accordingly, the ALJ's characterization of Dr. Ambrose's opinions as inconsistent with the majority of the treatment notes is not supported by the evidence in the record.

On the other hand, it is correct that Dr. Ambrose did not provide a function-by-function analysis of the Claimant's impairments.  Dr. Friedberg's opinions, however, were based upon a function-by-function analysis of the Claimant's capabilities. Nonetheless, the ALJ also gave them little weight, criticizing them on the basis that Dr. Friedberg examined the Claimant only once, and the "marked and extreme limitations contained in her opinion are not consistent with or well-supported by the other substantial evidence of record." *Id. at 29.*  Dr. Friedberg based her opinions on her detailed analysis of the Claimant's medical records and she also examined the Claimant.  The records that the ALJ claims are inconsistent with Dr. Friedberg's conclusions are the same records that the ALJ erroneously contended support a conclusion that "the large majority of the treatment notes in the record document[] normal mental status examination results." *Id.*   Again, the ALJ's

38

conclusion could be reached only by selecting evidence that supported her conclusion while ignoring contrary evidence. Therefore, this reason for rejecting Dr. Friedberg's opinions lacks merit.

The ALJ also rejected Dr. Friedberg's opinions because she found them inconsistent with the Claimant's reported daily activities, noting that the Claimant "reports no mental difficulties with her personal care and states that she can prepare simple meals, perform some household chores, count change, live with family, and attend religious services despite her impairments." *Id. at 30.* This opinion, which is stated at least five times in the ALJ's ruling, *Id. at 23, 24, 26, 29, 30*, is another example of the ALJ's selecting evidence that supports her conclusion while ignoring contrary evidence. First, there is evidence that the Claimant's mental difficulties do interfere with her personal care. She sometimes spends all day in bed and gets dressed only when required to do so. Her sister sometimes makes her get out of bed, get dressed, and take her medicine. To remember to take medicine, the Claimant sets an alarm and also depends on family reminders. Second, while there is evidence that the Claimant can prepare a sandwich or microwave a meal, there is no evidence that she actually completes any other household chores. To the contrary, the evidence is that she sometimes starts household chores but does not finish them, requiring her husband to do so. Third, while she lives with family, the treatment notes reflect that her relationship with her husband is rocky, her son's moving in

with them was a stressor that negatively impacted her mental health, and she was concerned about criticism from other family members.  Fourth, while she does attend religious services despite her impairments, she explained at the hearing that the church she attends has only about ten members and they are all also members of her family.   The evidence further indicates that, while at church, the Claimant is constantly looking over her shoulder, fearing that someone will come in and harm her.  Finally, although there is evidence that the Claimant can make change, there is no evidence that she can perform a job requiring her to do so for eight hours a day, five days a week.   Thus, the evidence in the record does not support the ALJ's conclusion that the Claimant actually engages in activities requiring a greater functional level than that claimed.

The ALJ gave only partial weight to the opinions of the state agency psychological consultant, Dr. Constantin, and found that the Claimant was more severely impaired than Dr. Constantin had found.  Dr. Constantin's opinions were rendered in August 2015; therefore, she was unable to review as many records from Tyler Behavioral Health Center as Dr. Friedberg did.   As the ALJ noted, Dr. Constantin "did not examine the claimant, and so her assessment did not benefit from firsthand knowledge and experience with her condition." *Id. at 29.*

In sum, the ALJ gave little weight to the opinions of treating psychiatrist, Dr. Ambrose; gave little weight to the opinions of consulting psychologist Dr. Friedberg;

and, gave partial weight to the opinions of consulting psychologist Dr. Constantin. Despite discrediting Dr. Friedberg's opinions because she saw the Claimant on only one occasion, the ALJ then gave greater weight to the opinions of Dr. Constantin, who did not examine the Claimant at all. "[T]he opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician."[42] The reports of physicians who did not examine the claimant do not constitute substantial evidence on which to base an administrative decision.[43] Here, the ALJ gave greater weight to Dr. Constantin's opinions than to those of Dr. Friedberg (who provided an exhaustive function-by-function analysis) or Dr. Ambrose. Therefore, the ALJ improperly weighed the medical opinions.

Finally, the ALJ is not a physician; consequently, the ALJ is not permitted to substitute her own opinion for that of Dr. Ambrose, Dr. Friedberg, or Dr. Constantin. "Although the ALJ may weigh competing medical opinions about. . . limitations and use objective medical evidence to support its determination that one opinion is better founded than another, neither the ALJ nor the court is free to substitute its own opinion."[44] By discounting the opinions of all of the medical professionals, the ALJ

---

[42]    *Bradley v. Bowen*, 809 F.2d at 1057.

[43]    *Kneeland v. Berryhill*, 850 F.3d 749, 761 (5th Cir. 2017) (citing *Strickland v. Harris*, 615 F.2d 1103, 1109 (5th Cir. 1980)).

[44]    *Fabre v. Astrue*, No. 13-00076-BAJ-RLB, 2014 WL 4386424, at *6 n. 6 (M.D. La. Sept. 4, 2014).

reached a conclusion inconsistent with them and based on her own opinions as to the Claimant's functionality.  This was error.

Because the ALJ identified no evidence in the record that contradicts Dr. Friedberg's conclusions and substituted her own opinions for those of the three mental health professionals whose opinions are contained in the record, the ALJ applied an improper legal standard in weighing the medical opinions, which led to findings on residual functional capacity and disability that are not supported by substantial evidence in the record.

### Conclusion and Recommendation

For the foregoing reasons, this Court recommends that the Commissioner's decision should be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to consider engaging the services of a psychologist or psychiatrist to evaluate the effect that the claimant's mental health conditions have on her functionality, to evaluate the claimant's residual functional capacity, and to evaluate whether the claimant has been disabled since either February 2, 2010 or January 18, 2014.  Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any

judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act ("EAJA").[45]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[46]

Signed in Lafayette, Louisiana, this 23rd day of March, 2020.

**CAROL B. WHITEHURST**
**UNITED STATES MAGISTRATE JUDGE**

---

[45]    See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

[46]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).